IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TIFFANY BROOKE PONCE ) | |
| ) | |
| v. ) | No. 3:13-0129 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:   The Honorable John T. Nixon, Senior Judge

REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for Supplemental Security Income (SSI) benefits, as provided under Title XVI of the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 18). The parties have further briefed select issues in subsequent filings. (Docket Entry Nos. 20, 23, 25, 33, 38, 41) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

I. Introduction

Plaintiff filed her application for SSI benefits on May 20, 2009, alleging

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

disability beginning April 15, 2006, due to depression and levoscoliosis. (Tr. 122, 153) Her application was denied at the initial and reconsideration stages of agency review, whereupon she requested *de novo* review of her claim by an Administrative Law Judge (ALJ). The ALJ hearing was held on September 7, 2011, and plaintiff appeared with counsel and gave testimony. (Tr. 31-61) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the ALJ took the matter under advisement until October 13, 2011, when he issued a written decision in which he concluded that plaintiff was not disabled. (Tr. 14-23) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since May 20, 2009, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: Congenital L3-4 fusion; bipolar disorder; and panic disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity for lifting/carrying 20 pounds occasionally and 10 pounds frequently; standing/walking 6 hours; sitting 6 hours; performance of only simple repetitive work; maintaining attention or concentration for no more than two hours without interruption; and no more than occasional interaction with others.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on August 10, 1988 and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English

(20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since May 20, 2009, the date the application was filed (20 CFR 416.920(g)).

(Tr. 16, 18, 21-22)

On January 24, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from defendant's brief, Docket Entry No. 18 at pp. 3-13:

### 1. Non-Medical and Vocational Evidence

As of October 13, 2011, the date of the ALJ's unfavorable decision, Plaintiff was 23 years of age, which is defined as a younger person (Tr. 122). See 20 C.F.R. § 416.963(c). As of April 15, 2006, Plaintiff's alleged onset date, she was 17 years of age (Tr. 153). Plaintiff has never worked (Tr. 153). She completed schooling through the 9th grade in regular education classes and earned her high school diploma through correspondence school (Tr. 34, 157).

Field office personnel noted that Plaintiff was neatly dressed for her interview and that she had a little girl about 15 months old with her that she was able to hold and pick up (Tr. 150). Further, Plaintiff was noted as having no difficulties hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, writing, using her hands or with coherency. Id. When asked how her illnesses, injuries, or conditions limit her ability to work, Plaintiff stated that she was in constant pain; she was unable to sleep; she had headaches and sometimes blindness (temporary) in her eyes; and her legs often got numb (Tr. 153).

Plaintiff testified to being in pain "24/7" (Tr. 168). Because of pain, Plaintiff could not play sports, play with her children much, clean much, or go where she needed to go (Tr. 169). Plaintiff added that the pain started in her spine, traveled to her head causing headaches, and went to her arms and legs (Tr. 169). Her legs got swollen, she passed out, and her legs and arms gave out on her. Id.

## 2. Medical Evidence

### a. Physical Health

Thoracic spine x-rays taken on April 28, 2009 showed mild scoliosis centered at the T5-T6 level, which measures 9 degrees (Tr. 244). T1 through L1 were normal without fractures or dislocations. Id. There was normal vertebral body alignment and intervertebral disc spaces. Id. Paravertebral soft tissues were normal. Id. Dr. Kartik Boorgu's diagnostic impression was 9 degrees of Levoscoliosis, otherwise negative.

On May 20, 2009, Plaintiff was examined by Laurin Revere, NP (Nurse Practitioner), whose observations were signed off on by Dr. David West, due to complaints of mid thoracic spine pain (Tr. 246-247). Treatment notes document that Plaintiff was ambulatory to the examination room and was able to sit on the examination table (Tr. 247). She had pain with palpation along the thoracic region of her spine, which got worse with extension and with right and left lateral flexion. Id. When Plaintiff bent forward, there was slight elevation noted on the left side of the thoracic region. Id. Her reflexes were +2 in her bilateral upper and lower extremities and muscle strength was equal, measuring 5/5. Id. She was able to walk on her toes and heels without difficulty. Id. Plaintiff was diagnosed with thoracic pain and lumbar pain. Id.

An MRI of the thoracic spine interpreted by Daniel Fowler, Radiologist dated May 21, 2009, revealed that:

> the thoracic intervertebral discs showed a normal signal and configuration with no posterior protrusion; the thoracic and visualized portions of the lower cervical and upper lumbar spinal canal were widely patent without stenosis; the thoracic and visualized lower cervical spinal cord shows a normal signal and configuration; the spinal cord ends the level of L1; the thoracic and visualized lower cervical and upper lumbar vertebral bodies show a normal signal, configuration and alignment.

(Tr. 248). Dr. Fowler found the anterior portion of the L3-4 disc space was fused and the remainder of the disc space was narrowed, which was most likely congenital (Tr. 249). He also found the right and left posterior facet joints at L3-4 appeared narrowed, which was also probably congenital. Id. He diagnosed partial congenital fusion of L3 and L4 vertebral bodies, otherwise normal MRI of the lumbar spine. Id.

State agency medical consultant Dr. Reeta Misra assessed Plaintiff's physical residual functional capacity (RFC) on July 14, 2009, finding the Plaintiff can occasionally lift 50 pounds, frequently lit 25 pounds, stand and walk about 6 hours with normal breaks, and push and pull as [required] for lifting and carrying (Tr. 251). Dr. Misra opined the Plaintiff had no Postural, Manipulative, Visual, Communicative or Environmental Limitations (Tr. 252-258). Dr. Kanika Chaudhuri, also a State agency medical consultant, confirmed Dr. Misra's exam findings on April 28, 2010 (Tr. 349-357).

On August 26, 2009, Plaintiff was examined by Steve Humphrey, M.D.P.C., due to bursts of very high heart rate into the 170 beats per minute range as measured by a Holter monitor, which appears to be sinus in origin (Tr. 277). Dr. Humphrey noted that Plaintiff was "relatively sedentary with the exception of chasing her five-year-old and 18-month-old children." Id. Physical exam notes showed Plaintiff's blood pressure was 94/60 with a heart rate of 80 beats per minute, weight was 111 pounds, and no distress (Tr. 278). Dr. Humphrey's diagnostic impression was seemingly inappropriate sinus tachycardia on Holter monitoring; atypical chest discomfort that is not suggestive of a cardiac etiology; and anxiety and depression. Id.

An Exercise Treadmill Stress Test report by Dr. Humphrey dated August 26, 2009, concluded it was a "[n]ormal exercise stress test in a patient who easily exceeded target heart rate without concerning symptomatology; [g]ood exercise capacity and hemodynamic recovery; and [n]o arrhythmia" (Tr. 279). A 2D Echo with M-Mode and Doppler report performed by Dr. Humphrey the same day concluded "[o]verall left ventricular systolic function [was] normal with an EF between 55-60% with no wall motion abnormality; [t]he diastolic filling pattern [was] normal for the age of the patient; [t]rivial tricuspid

regurgitation present; and [p]ulmonary pressure: Normal" (Tr. 280). A Head CT [without] Contrast performed by Colin Meyerowitz, M.D. found:

> The ventricles are normal in size. There is no mass effect or midline shift. No extra-axial fluid collections are seen. There are no abnormal areas of increased or decreased attenuation demonstrated. No intracranial hemorrhage identified. Sella turcica is seen to be of normal size. The orbits are unremarkable. The visualized paranasal sinuses show no obvious abnormality.

(Tr. 281). Dr. Meyerowitz opined it was a "[n]ormal head CT without contrast." Id.

Plaintiff began treatment with Dr. Willard West on March 11, 2010, due to complaints of scoliosis, severe back pain all the time, and constipation (Tr. 388). Dr. West noted that Plaintiff's previous provider told her to take Tylenol and that she needed something stronger. Id. X-rays of Plaintiff's cervical spine taken March 11, 2010 by Dr. Alan Erickson found mild prominence of the adenoids, alignment straightening of the cervical lordosis which might reflect muscle spasm, otherwise normal (Tr. 403). Dr. Erickson found alignment straightening of Plaintiff's lumbar lordosis, previous fusion of L3-L4 disc, but otherwise normal x-rays of Plaintiff's lumbar spine taken the same day (Tr. 402). Thoracic spine x-rays by Dr. Erickson showed possible minimal scoliosis versus positional artifact but an otherwise normal thoracic spine (Tr. 401). On June 16, 2010, Dr. Falouji examined the Plaintiff at Dr. West's request and performed an EMG/NCS of Plaintiff's right lower extremity concluding "[t]here [was] no electrophysiological finding consistent with diffused generalized peripheral neuropathy" (Tr. 426). Dr. Falouji's diagnostic impression included syncope and collapse, consciousness alteration, insomnia and idiopathic scoliosis (Tr. 424-425). A Unilateral Lower Extremity Arterial Duplex ultrasound performed on June 24, 2010 by Dr. Metzman showed "no significant stenosis involving the arterial system of the right lower extremity" (Tr. 400). An MRI of Plaintiff's brain taken on August 19, 2010, by Byard Edwards, M.D., showed no abnormality (Tr. 407). A CT of the Lumbar Spine without contrast report dated October 20, 2010, confirmed partial fusion of the vertebral body at the L3-5 level, facet disease at the L5-S1 level, and normal appearing soft tissues (Tr. 404). On December 17, 2010, Physician's Assistant Rodney Richmond noted that Plaintiff was "seen by Dr. Kaufmann who indicated that there is no significant finding in her back that would account for pain and that she should not be on opioids" (Tr. 360). He noted Plaintiff's medications as Lortab for pain, bisoprolol and hydrochlorothiazide for hypertension, buspirone for anxiety, cyclobenzaprine (Flexeril) for back pain, hydroxyzine (antihistamine), lamotrigine for seizures, lodine is a nonsteroidal anti-inflammatory drug, metoclopramide for heartburn, and paroxetine (Paxil) for depression. Id.

On July 11, 2011, Dr. West noted that Plaintiff was in to talk about her disability application and for acne medication (Tr. 369). Physical exam findings were all normal. Id. Dr. West completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) opining that Plaintiff had mild impairment in her ability to understand and remember simple instructions, carry out simple instructions and make judgments on simple work-related decisions; with marked impairment in her ability to carry out complex instructions and her ability to make judgments on complex work-related decisions; and extreme impairment of her ability to make judgments on complex work-related decisions due to short term memory loss (Tr. 409). Further, he opined Plaintiff had mild impairment of her ability to interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting (Tr. 410).

Dr. West also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), opining that the Plaintiff could occasionally lift up to 20 pounds but never over 21 pounds; she can sit for four hours, stand for 10 minutes and walk for 10 minutes without interruption; in an 8 hour workday, Plaintiff could sit for 4 hours, stand for 30 minutes, walk for 30 minutes, and lie down for the balance of the day, which is three hours; she could occasionally reach (all directions), handle objects, and push/pull with both her right and left hand, but she could frequently finger and feel with both hands due to chronic back pain; and Plaintiff could occasionally operate foot controls with both feet due to chronic back pain (Tr. 412-414). Plaintiff could never climb stairs, ramps, ladders or scaffolds, balance, stoop, kneel, crouch or crawl (Tr. 415). Plaintiff's hearing and vision were impaired. Id. Plaintiff could never tolerate exposure to unprotected heights, she could occasionally be exposed to moving mechanical parts and operate a motor vehicle, and she could continuously be exposed to humidity and wetness, dust, fumes, and pulmonary irritants, extreme cold, extreme heat vibrations, and hazards (Tr. 416).

### b. Mental Health

Plaintiff had an intake appointment on January 2, 2009, and follow up sessions through May 18, 2009, with an unnamed provider with unknown credentials through the Nashville Medical Group (Tr. 237-231). Plaintiff complained of depression, back pain, insomnia, anxiety, seizures, gluteal dimpling, neuropathy, pain with swallowing, and thoracic spinal pain. Id. On March 26, 2009, Plaintiff reported discontinuing her anti-depressant medication, Lexapro, she was reportedly in a better mood, and sleeping better (Tr. 235). By April 28, 2009, despite complaints of worsening spasms, no improvement on medications, mid-back pain, aching joints, hurting all over upon waking, and gluteal dimpling, Plaintiff "was doing much better regarding depression" (Tr. 233). In fact, she was

"not presently depressed." Id. There are multiple diagnoses throughout these treatment records – anxiety, insomnia, depression, thoracic spinal pain, gluteal dimples with neuropathy – but the signature of the treatment provider is illegible (Tr. 231-243).

Arthur Stair III, M.A., Licensed Psychological Examiner (LPE) examined Plaintiff on August 27, 2009, diagnosing major depressive disorder, moderate and anorexia nervosa and assessing her Global Assessment of Functioning (GAF) at approximately 55 (Tr. 270). He noted that Plaintiff's thinking pattern appeared to be fairly well organized. Id. She did not have difficulty maintaining a logical and coherent train of thought. Id. He described her affect as dysphoric. Id. He did not observe any unusual or bizarre behaviors or mannerisms. Id. Plaintiff did not mention hallucinations or delusional beliefs. Id. She was responsive to questioning; her speech was within normal limits and was articulated adequately for understandability. Id. Plaintiff maintained good eye contact. Id.

Mr. Stair opined the Plaintiff appears to be relatively well suited for a wide range of noncomplex jobs in terms of her cognitive ability but her depression and resulting low self-esteem get in the way of her ability to comfortably deal with the public or employers and that she would work best in relatively solitary conditions (Tr. 269). The claimant appeared to be fully capable of understanding simple information or directions with the ability to put it to full use in a vocational setting. The claimant's ability to comprehend and implement multistep complex instructions was estimated to be at least mildly impaired given the claimant's suspected low-average IQ (Tr. 270). The claimant's ability to maintain persistence and concentration on tasks for a full workday and workweek was at least moderately impaired, given the claimant's moderate major depressive disorder. Id. The claimant's social relationships were moderately impaired as she reports withdrawal from others due to depression. Id.

Dr. Terry Edwards completed a second consultative psychiatric evaluation on September 24, 2009 (Tr. 304-397). He specifically noted that Plaintiff seemed to exaggerate her symptomatology (Tr. 307). He opined that Plaintiff would be able to follow simple instructions with marked impediment in social functioning and moderate problems with focus (Tr. 307).

Plaintiff began psychiatric treatment at Centerstone November 13, 2009, when Gregory Gannon, MSN performed a psychological evaluation that was signed by Dr. Phillip Anderson (Tr. 345). It shows a primary diagnosis of Bipolar II disorder, most recent episode depressed, a secondary diagnosis of Panic disorder without agoraphobia, and a Global Assessment of Functioning rating of 50, which indicated serious symptoms or any serious impairment in social, occupational, or school functioning (Tr. 345-346). In addition to

medication management, Plaintiff attended a counseling intake on November 6, 2009 (Tr. 332-337, 339); attended five counseling sessions, had eight case management sessions, did not attend the care plan clinical summary on April 26, 2011, and failed to show for or cancelled her appointments 29 times. Her case was closed to case management on September 2, 2010.

### 3. July 21, 2010 Hearing Testimony

Plaintiff testified that she has "mood swings really bad" and that she goes through "depression spells where [she] can't get out of bed, eat, drink nothing for months at a time" (Tr. 34). Her "organs were shutting down because [she] was in such a bad depression." Id. She "just wake[s] up angry and just hate[s] the world." Id. Her mother is the only person in her life, she isolates, does not get along with people, and she does not want to be around other people. Id. Being around people increases her anxiety and nerves (Tr. 35). Her mother has to take her to her appointments because she has seizures, "sometimes eight to ten times a day" (Tr. 36). Plaintiff testified that "[n]ow that [she] is on medication, they happen a few times a week, sometimes maybe two or three times a month" (Tr. 36-37). She further testified that she "passed out eight times going down the interstate having to pull over" (Tr. 37). Moreover, "[she] feel[s] them coming on because the pain starts in [her] back and it shoots up to the back of [her] head, and everything goes black, and [her] arms and legs give out on [her]." Id. Plaintiff testified that her chronic back pain triggers her seizures. Id.

Plaintiff testified that her spine was turning around backwards slowly, surgery was recommended, but her doctors wanted to wait until she is at least 25 because they wanted her to gain weight and be a little bit older (Tr. 38). She rated her pain at a seven on a zero to ten scale when she was taking her medications and she used a transcutaneous electrical nerve stimulation (TENS) unit, heating pad, and Flexor patches (Tr. 39).

For 10 to 12 months leading up to her hearing, Plaintiff could not stand to take a shower, she had to sit (Tr. 40). She could only sit for 10 minutes without pain because "[her] tailbone is longer than other people, and it, like, rips – the skin rips when [she] sit[s] down or [tries] to bend over, [her] skin rips apart at the – on [her] tailbone." Id. She could stand for 20 minutes before the pain kicks in and could walk 15 to 20 minutes before needing to take a rest break (Tr. 41). Plaintiff testified that her seven-year-old son went to school but her three-year-old daughter is home with her all day (Tr. 40).

Plaintiff had never heard of the Division of Rehabilitation Services, nor had she held a full-time job for at least one month (Tr. 42). She testified that she held a job for two weeks but they let her go because she was "just not smart enough." Id. Plaintiff did not get any mental health treatment until November 2009, which is six months after she applied for SSI

(Tr. 45, 122). She testified that her mood swings started when she was seventeen years old but she never told anyone about them even though they prevented her from working, until her Mom told her about Centerstone (Tr. 44-45). Plaintiff began receiving public assistance when her then-husband left her after her son was born, but she did not participate in the required work programs due to her health (Tr. 47-48). Her mother helped her with her children.

Vocational expert (VE), Pedro M. Roman, also testified (Tr. 50). The ALJ asked the VE:

> If I were to consider a hypothetical worker who was 23 years old, who had a 9th grade education and no past relevant work, who is capable of medium work, except that the hypothetical worker was limited to simple, repetitive work, was not able to maintain attention or concentration for more than two hours without interruption, and could not have more than occasional interaction with others. Would you be able to identify any jobs that the hypothetical worker could perform?

(Tr. 50-51). The VE responded that such an individual could be an automobile detailer, specific vocational preparation (SVP) of 2 (3,507 jobs locally, 189,317 nationally); caretaker/cleaner of homes, SVP of 2 (7,091 jobs locally, 364,649 nationally); and housekeeper, SVP of 1 or 2, (7,091 jobs locally, 364,649 nationally) (Tr. 51-55). When the ALJ asked if jobs existed for the same hypothetical individual at the light exertional level, the VE responded that such an individual could be a finisher, SVP of 2 (3,143 jobs locally, 124,889 nationally); pricing tagger, SVP of 2 (6,960 jobs locally, 309,745 nationally); and assembler, small products, SVP of 2 (7,027 jobs locally, 216,533 nationally).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).  Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached.  E.g., Longworth v. Comm'r of Soc. Sec., 402 F.3d 591, 595 (6th Cir. 2005).  Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

### B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

>   1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>   2) A claimant who does not have a severe impairment will not be found to be disabled.
>   3) A finding of disability will be made without consideration of vocational

factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the

analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in his consideration of the Tennessee Clinically Related Group (CRG) evaluations completed by staff at Centerstone, including the Global Assessment of Functioning (GAF) scores contained in those evaluations, inasmuch as he did not comply with the applicable directives of Social Security Ruling 06-3p regarding opinion evidence from "other sources." The ruling contemplates the inclusion in claimants' medical records of opinions from health care professionals who are not "acceptable medical sources" under the regulations, but who are nonetheless increasingly more involved with first-line care in the offices of both physical and mental health care providers, and who thus may in some cases be the best sources of information as to the effects of their patients' impairments. Such "other source" opinions must be considered in reaching the disability determination. 20 C.F.R. § 416.913(a), (d)(1).

However, SSR 06-3p does not require ALJs to give explicit attention in their decisions to every shred of opinion evidence, as detailed below:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case. In addition, when an adjudicator

13

> determines that an opinion from such a source is entitled to greater weight than a medical opinion from a treating source, the adjudicator must explain the reasons in the notice of decision....

2006 WL 2329939, at *6. Thus, the ALJ *must* explain his or her weighing of such evidence in cases where the evidence is held to outweigh a treating source's medical opinion, as evidence of the claimant's ability to perform work. Otherwise, the ALJ should make explicit his consideration of "other source" evidence, if not the actual weight such evidence is given, where that evidence could potentially sway the ultimate determination of the claimant's case toward a finding of disability. This is not a demanding standard. <u>Morris v. Comm'r of Soc. Sec.</u>, 2012 WL 4953118, at *11 (W.D. Mich. Oct. 17, 2012).

The ALJ in the case at bar gave the following account of plaintiff's treatment at Centerstone:

> The claimant was also treated at Centerstone Mental Health Center only three times over a year and a half period. She was diagnosed with bipolar II disorder, as well as depressed disorder and panic disorder. Her Global Assessment of Functioning ("GAF") scores over that time period were consistently 50, which indicates borderline moderate difficulty in social and occupational functioning per the DSM-IV-TR (Exhibit 20F). In a medical progress note dated April 9, 2010 the claimant stated in her "Interval History" that she was doing better, her mood was euthymic, and her appetite, energy and sleep were good. She denied any suicidal or homicidal ideation, and any alcohol or drug problems; further, that she wished to continue her medications, claiming they helped her and denied any side effects or adverse reactions.
>
> Two Clinically Related Groups ("CRG") were completed by providers at Centerstone in November 2009 and again in November 2010. Marked limitations were given in all four major categories (Exhibits 10F and 20F); however, the CRG Forms were not consistent with the very limited treatment records.

(Tr. 21) While plaintiff claims that the ALJ failed to mention or apply SSR 06-3p in his decision, a general reference to the ruling and its requirements was in fact given in the ALJ's decision (Tr. 18), and the undersigned finds that the reason given for rejecting the marked limitations and GAF scores contained in the CRG assessments and elsewhere in the Centerstone records -- that such limitations are not consistent with the plaintiff's condition as described in the actual treatment notes -- is sufficient. The ALJ's reference to plaintiff being "treated" at Centerstone only three times over a year and a half period appears to refer only to those few occasions when she was seen for medication maintenance, as the ALJ otherwise recognized the 85 pages of Centerstone records contained in Exhibit 20F (Tr. 21), much of which dealt with her counseling and case management appointments. While the parties have argued *ad nauseum* over the utility of CRG forms and GAF scores -- the final brief in their protracted rally is captioned "Defendant's Response to Plaintiff's Response to Defendant's Response to Plaintiff's Sur-Surreply Brief" -- it is clear to the undersigned that the ALJ gave such matters all the attention they were due, and properly relied on the notations in the Centerstone medical maintenance notes to justify assigning moderate mental limitations. As defendant's initial response brief points out (Docket Entry No. 18 at 16-17), the CRG forms are a means of ascertaining the patient's mental health treatment classification for purposes of TennCare and thus, to the extent that any ratings reflected in such forms are properly considered opinion evidence from "other sources" pursuant to SSR 06-3p, their potential to materially impact the determination of the claimant's work-related abilities and limitations is extremely limited.

    Likewise, while a GAF score of 50 is the highest score in the 10-point range indicating "serious symptoms" or "any serious impairment in social, occupational, or school

15

functioning," American Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000), and perhaps not properly characterized, as the ALJ did here, as a score indicating "borderline moderate" impairment (Tr. 21), such a score is of no particular value in interpreting the Centerstone staff's opinion as to plaintiff's functional abilities/limitations. GAF scores are not a reasonable replacement for the more particularized data available in actual treatment notes or reports of examination results, but instead are largely superficial descriptors representing "a clinician's subjective rating of an individual's overall psychological functioning" in terms "understandable by a lay person." See, e.g., Kennedy v. Astrue, 247 Fed. Appx. 761, 766 (6th Cir. Sept. 7, 2007); see also, e.g., Smith v. Astrue, 565 F.Supp.2d 918, 925 (M.D. Tenn. 2008). To the extent that the ALJ erred in deeming the GAF score of 50 essentially equivalent to a score of 51 (at the bottom of the 10-point range indicating moderate symptoms), any such error is harmless in view of the level of functioning apparent from the medical progress note which the ALJ relied upon, describing plaintiff's significant improvement with medication (Tr. 21, 496-97), as well as other such notes in the Centerstone records that are inconsistent with "marked" or "serious" functional limitations. See Tr. 532 (recording plaintiff's Interval History as "'I'm doing ok'; taking the medication and so far 'seems to be doing well'; moods are improving - less labile 'oh yeah!' - smiles, relationships w/ family and friends are more stable. [A]ppetite, energy and sleep are fine.").

The undersigned further finds that the ALJ did not erroneously fail to perceive support for the CRG ratings of marked limitations in the opinion of consultative psychological examiner Dr. Terry Edwards, who assessed plaintiff with marked limitations on social interaction. The ALJ explained that this September 2009 assessment by Dr.

16

Edwards was also inconsistent with plaintiff's report of symptom control with medications beginning when she first sought outpatient care in November 2009. (Tr. 21) The ALJ's finding of moderate mental limitations is supported by substantial evidence.

Plaintiff next argues that the ALJ erred in rejecting the opinion of her treating physician, Dr. Willard M. West (Tr. 412-17), which the ALJ described as "not[ing] extreme physical limitations including a need to lie down for three hours during an 8-hour workday and a total inability to perform all postural activities." (Tr. 19) The ALJ weighed Dr. West's opinion as follows:

> I do not credit Dr. West's opinion here for a number of reasons. First, the doctor's office note about claimant of the same date was completely routine (Ex. 13F, p. 12). The claimant came for a face-to-face appointment on disability and only requested medication for acne. Her physical examination was entirely negative and resulted in no abnormal findings. In a December 17, 2010 note (Exhibit 13F, p. 3), Dr. West details the absence of any significant findings despite massive workups in response to claimant's complaints of pain. Specifically, Dr. West noted that there had been no discovered pathology for the claimant's back complaints and that she should not be taking narcotic pain relievers. Finally, I note that a complete inability to stoop would be inconsistent with claimant's observed ability to bend forward at the waist and assume a seated position during her hearing. See SSR 85-15.

(Tr. 19-20) The undersigned finds these reasons to be good and sufficient for the rejection of Dr. West's assessment. Plaintiff points to items in the medical record which support her consistent attempts to achieve relief of her back pain, and her providers' consistent treatment of that pain. Notably, however, the ALJ did not reject her allegations of pain-related limitation; indeed, he found that the objective medical evidence and plaintiff's partially credible allegations supported a level of pain that would not allow for the medium exertional capacity which the nonexamining consultants assessed (Tr. 19), but instead allowed only

17

light exertion. The ALJ properly noted the inconsistency between Dr. West's dire assessment on the one hand, and his treatment notes and plaintiff's report of less limiting symptoms on the other. (Tr. 20) Good reasons were given for the rejection of Dr. West's assessment. It is not for this Court to re-weigh the evidence or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984). The undersigned finds no error here.

Finally, plaintiff argues that the ALJ erred by failing to properly consider all of her impairments at the second step of the sequential evaluation process, and by failing to adequately explain his reasoning as to why certain impairments were not identified as severe. Specifically, plaintiff complains that the ALJ overlooked the severity of her degenerative disc disease of the lumbar and thoracic spine, facet syndrome, spinal enthesopathy, and insomnia. However, the ALJ did all that he was required to do at the second step: he identified impairments that would be expected to have a significant effect on plaintiff's ability to perform work-related activities, and proceeded to the third step of the sequential evaluation. (Tr. 14-15) The regulations do not require that all diagnosed impairments be scrutinized for their severity. Indeed, even an erroneous finding of impairment nonseverity cannot amount to reversible error, so long as at least one severe impairment is identified and the sequential evaluation continues. See Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987). Ultimately, a claimant's residual functional capacity is determined in view of the combined effects of *all* medically determinable impairments, severe and nonsevere alike. Accordingly, the fact that some of plaintiff's diagnosed impairments went unmentioned at the step two severity determination is "legally irrelevant." Anthony v. Astrue, 266 Fed. Appx. 451, 457 (6th Cir. Feb. 22, 2008)

18

(citing Maziarz, supra).  The pain and other symptoms related to plaintiff's spine condition were fully considered by the ALJ in making his findings at subsequent steps of the sequential evaluation process.  With regard to plaintiff's insomnia, reports of same were not entirely consistent (Tr. 21 (describing plaintiff's report of good energy and sleep)), and the ALJ addressed the limitation which is alleged to result from her insomnia, finding her alleged deficits in attention and concentration to be contradicted by her ability to earn her GED and her reported desire to pursue further schooling (Tr. 20), but nonetheless to result in a significant workplace limitation.  (Tr. 18)  The undersigned finds no error here.

In sum, the undersigned finds the decision of the SSA to be supported by substantial evidence on the record as a whole, and therefore recommends affirmance of that decision.

### IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985);

Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 22nd day of October, 2015.

                                                      s/ John S. Bryant
                                                      JOHN S. BRYANT
                                                      UNITED STATES MAGISTRATE JUDGE